## MACK ARTHUR HOLBROOK *v.* STATE OF MARYLAND

[No. 231, September Term, 1968.]

*Decided March 11, 1969.*

*Frank C. Sherrard* for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Donaldson C. Cole, Jr., State's Attorney for Cecil County,* and *Julius J. Jodlbauer, Assistant State's Attorney for Cecil County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant was found guilty by a jury in the Circuit Court for Cecil County of assault upon and battery of Ralph Newton and sentenced to 10 years.[1]

At the close of all the evidence, a motion for judgment of acquittal was made and denied and the court instructed the jury. Thereafter the State opened the argument to the jury, defense counsel argued in behalf of the appellant and the State made closing argument. The appellant claims that the closing argument of the State denied him a fair and impartial trial.[2]

Of course, the prosecutor may not make statements to the jury which exceed the limits of permissible comment. What exceeds the limits of permissible comment depends a good deal on the

---

[1]. This offense was charged in the 4th count of the indictment. The 1st count charging mayhem and the 2nd count charging malicious injury with intent to disfigure were dismissed prior to trial upon motion by the appellant. The 3rd count charging assault with intent to maim was dismissed upon motion by the State at the close of all the evidence.

[2]. The closing argument of the State is contained in Appendix A hereto. The record does not contain a transcript of the other arguments.

facts of each case, even where remarks may fall into the same general classification. *Shoemaker v. State,* 228 Md. 462, 468. Generally the prosecutor has an obligation to refrain from making any remark within the hearing of the jury which is likely or apt to instigate prejudice against the accused. Thus an appeal to racial or religious prejudice is improper. *Contee v. State,* 223 Md. 575, 584. The better reasoning and weight of authority are against the propriety of remarks as to the right of appeal and the possibility of executive clemency and parole of the defendant. *Shoemaker v. State, supra,* at 468. It is improper for the prosecutor to assert his personal belief or personal conviction as to the guilt of the accused, if that belief or conviction is predicated upon anything other than the evidence in the case, but he has the undisputed right to urge that the evidence convinces his mind of the accused's guilt. *Cicero v. State,* 200 Md. 614, 620-621; *Apple v. State,* 190 Md. 661, 666; *Riggins v. State,* 125 Md. 165, 174. Appeals to passion may so poison the minds of jurors that an accused may be deprived of a fair trial. *Wood v. State,* 192 Md. 643, 652. It is the duty of the prosecutor to confine himself in argument to facts in evidence, and he should not state and comment upon facts not in evidence, or to state what he could have proven. *Esterline v. State,* 105 Md. 629, 637. "It is unquestionably wrong for the State's Attorney in his argument to the jury to refer to any matter not testified to by the witnesses or disclosed by the evidence in the case * * *." *Toomer v. State,* 112 Md. 285, 292-293. As Wharton puts it in his 5 *Criminal Law and Procedure* (Anderson) § 2081, p. 241, "Moreover, since it is the duty of the prosecuting attorney to act impartially to achieve justice, he should avoid urging upon the jury any inferences which are not logical deductions from the evidence in the case." In short, the prosecutor should make no remark "calculated to unfairly prejudice the jury against the defendant." *Newton v. State,* 147 Md. 71, 92; *Meno v. State,* 117 Md. 435, 441.

The fact that in Maryland the jury is the judge of the law as well as of the facts does not mitigate the consequence of an improper statement by the prosecutor. *Shoemaker v. State, supra,* 472. But that a remark made by the prosecutor in argument to the jury was improper does not necessarily compel that

the conviction be set aside. For example as the Court of Appeals said in *Toomer v. State, supra,* 293, quoting *Dunlop v. The United States,* 165 U. S. 486:

"If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation."

The rule is that "unless it appears that the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused by the remarks of the State's Attorney" reversal of a judgment of conviction will not be justified. *Wood v. State, supra,* 652. *Kellum v. State,* 223 Md. 80, 88. See *Shoemaker v. State, supra,* 473-474. In applying this rule it appears that a significant factor in determining whether the jury were likely to have been misled or influenced to the prejudice of the accused by an improper remark is whether the trial court took appropriate action to overcome a likelihood of prejudice, *e.g.* informing the jury that the remark was improper, striking it and admonishing them to disregard it. When such action, found to be sufficient by the reviewing court, was taken, the judgments were affirmed. *Cohen v. State,* 173 Md. 216, 230-232; *Callan v. State,* 156 Md. 459, 469; *Newton v. State, supra,* 92; *Esterline v. State, supra,* 637; *Cox v. State,* 3 Md. App. 136, 141. And in *Shoemaker v. State, supra,* and *Meno v. State, supra,* where such action was not taken by the trial court, the judgments were reversed.

The question arises as to the preservation on appeal of the question of improper statements of the prosecutor in argument. This Court will not ordinarily decide any point or question which does not plainly appear to have been tried and decided by the lower court. Md. Rule 1085. In *Cicero v. State, supra,* the Court noted that no objection was made to the challenged argument and thus there was a waiver of the error and an estoppel in the Court of Appeals. But we do not think that error is waived by failure to object at the moment the improper statement is

made in the argument.[3] See Md. Rules 522b and 725f. In *Day v. State,* 2 Md. App. 334 we noted that there was no exception or objection taken at the time of the State's Attorney's final argument. We said, at 340, "If the accused desired to complain of an alleged impropriety in the State's Attorney's closing argument he should have either moved to strike it out or moved to withdraw a juror and declare a mistrial." We do not take this to mean that the point is not preserved unless the State's argument is interrupted by objection or motion. Although it may be better for defense counsel to object when the statement is made during argument, we think that objection is timely when brought to the attention of the trial court when it has a reasonable opportunity to correct the situation at the conclusion of the argument.[4] We note also that there is an obligation on the trial court in certain circumstances even in the absence of objection. In *Viereck v. United States,* 318 U. S. 236 the accused did not object at the time "highly prejudicial" remarks were made by the prosecutor, but objected during the court's charge to the jury, which objection was overruled as too late. The Supreme Court said that the trial judge should have stopped counsel's discourse without waiting for an objection.[5] In *Meno v. State, supra,* the Court said, regarding the "highly improper" action of the State's Attorney in injecting an improper statement into the case (not in argument), that "he should have been checked immediately by the Court, and the jury instructed to totally disregard his remark." And the trial court's responsi-

3. Md. Rule 522d2 relating to waiver of objection applies only to objection to the admissibility of evidence.

4. In *Shoemaker v. State, supra,* objection was made during the argument and overruled. The Court said, at 467, "We think it was not necessary, in order to preserve the point for review, to renew the objection by motion to strike or a mistrial when the State's Attorney proceeded to make the argument which the court had just allowed him to make."

5. The case was reversed on other grounds and as pointed out in *Apple v. State, supra,* at 667, the Court did not have before it the question whether the failure of the trial court to take action *sua sponte* would be reviewable if no objection was made and if the question was not brought to the attention of the trial court when it had an opportunity to correct the situation.

bility may not end with overruling an objection made. "[I]n addition to sustaining an objection to an improper remark or misconduct, (the trial court) is also entrusted with further responsibility to caution or reprimand the State's Attorney as the exigencies of the situation may require and to forthwith instruct the jury to disregard the unwarranted remarks and conduct of the prosecuting attorney." *Contee v. State, supra,* 584. And even absent an objection or action by the trial court, "[i]t is, of course, true that in a criminal case where grave error has been committed, and the accused is thereby denied due process, an appellate court may and should on its own motion, reverse the conviction." *Apple v. State, supra,* 667-668.

With this background we turn to the instant case. At the conclusion of the State's closing argument defense counsel told the court that he would like "to take some exceptions to the State's Attorney's argument." The court suggested it could be done during the lunch hour in chambers and the court recessed. In chambers, in the presence of the appellant, defense counsel moved for a mistrial "because of the closing argument made by the Assistant State's Attorney." He said:

> "We particularly feel that the entire tenor of the closing argument was improper, and especially refer to statements made that the defendant had been on the witness stand many times when there was no evidence the defendant had ever testified in court; statements that Mr. Newton had told the State's Attorney the same version on numerous occasions when there was no testimony on that point; particularly to his argument to the jury that the defendant was mentally defective, and that the fact of his being mentally defective could be proven by the fact he had been convicted of assault and battery on several prior occasions. We particularly feel that the Court had instructed the jury and had limited the use of the prior convictions solely to a matter of credibility and that any attempt to show or any argument to show that he was mentally defective because of prior convictions is wholly prejudicial.
>
> Further, the argument was made that since the defendant had been convicted of assault and battery on

prior occasions, you say to yourself, I wonder if he did it again, and we feel that this once again is using the prior convictions improperly; argument on prior convictions should be used as evidence to convict if necessary in a particular case."

The prosecutor responded by characterizing his comment, "Anyone that has got a record like that has got mental problems, something wrong with him," as "just a statement in argument. It has nothing to do, anything that the jury cannot decipher on their own." He thought the statement that the appellant had been on the witness stand many times before not improper because he had a record. "As far as the statement that the defendant has been convicted before, I wonder if he did it again, I still think it is proper for a closing argument." The court denied the motion for a mistrial. Noting that no objection was made during the argument, although exceptions were taken at its close, it said:

"The Court has had a chance to observe counsel during argument and to hear the arguments, the tenor of the arguments, the relationships of the parts of the arguments to each other, and the overall argument, and believes without question that the State's Attorney was sufficiently circumspect and within proper limits of a closing argument and the rules applying thereto.

The Court might note that defense counsel was given considerable latitude in reading from Trial Magazine, relating their personal experiences at the Bunny Club, reciting prayers of Benedictine Monks, and quoting poetry in their closing argument."

It is clearly established that past convictions of an accused, with exceptions not here applicable, may be considered by the trier of fact only as to his credibility. *Hayes v. State*, 3 Md. App. 4, 10. The trial court so charged the jury:

"[T]he defendant's criminal record is admitted into evidence for the sole purpose of assisting you in evaluating the defendant's credibility, that is, his worthiness of belief. You should not attempt to draw any in-

ferences of guilt from the fact he has been convicted on prior occasions. In other words, his previous convictions have nothing whatsoever to do with his guilt or innocence of the offense with which he is now charged."

Thereafter, during his closing argument the prosecutor referred to the prior record of the appellant on three separate occasions.[6] At the first, near the beginning of the argument, stating he was "sick and tired" of defense attorneys telling him or inferring that he and the police department were "out to get this man because he has got a record," he said, "He has got a record of four assaults and batteries because he committed them. Can you imagine that? He assaulted people four times, among other things." The prosecutor drew the conclusion therefrom that the appellant "has been on the witness stand many times." Toward the middle of his argument, the prosecutor referred the second time to the prior record: "Then they said, well, now, the State likes to infer that a person who has got a record and takes the witness stand will lie. I won't say that on behalf of the State at any time. The reason that a man's record is brought out, if he takes the stand, is his credibility to tell you the truth. That is the only thing. Now, what he did in the past, what is involved there, is credibility. What you are doing, you balance the credibility of a man that has all these convictions and you say, well, I wonder if he did it again? I think the evidence shows that he did it again." The third occasion was near the end of his argument. He said: "I think he has got mental problems. Anyone that has got a record like that has got mental problems, something wrong with him."

We think the reference to the appellant's prior convictions as made on each of the occasions was improper. The first and third had no relation to credibility. On the first he emphasized to the jury that the appellant had "assaulted people four times, among other things." (The only other "thing" shown was a disorderly conduct conviction on which he was fined $14). He

---

6. It appeared from the direct and cross-examination of the appellant that he had been convicted of assault and battery in 1960, 1961, 1965 and 1967 and of disorderly conduct in 1966.

asked the jury if they could "imagine that?" He concluded from the convictions that the appellant had been on "that witness stand many times." On the third occasion he used the prior convictions to convince the jury that the appellant "has got mental problems." On the second occasion he related the prior convictions to the appellant's credibility. But he misstated what "credibility" as used in the rule means. He said that he would not say "at any time" that "a person who has got a record and takes the witness stand will lie." But the rationale of the rule is that "a man who has been convicted of a serious crime is more likely to tell an untruth than a man who has never been convicted of a serious crime." *Piles v. State,* 233 Md. 487; *Culver v. State,* 1 Md. App. 406. The statement, "the reason that a man's record is brought out, if he takes the stand, is his credibility to tell you the truth," is redundant but correct. Then, however, he defines "credibility" as what the appellant "did in the past, what is involved there." He then tells the jury to "balance the credibility" of a man who has all these convictions and ask themselves, "Well, I wonder if he did it again?" The clear import was that the jury could consider the prior convictions as showing that the appellant committed the crime for which he was being tried. That this is what the prosecutor intended is borne out by his response to the exception taken—"As far as the statement that the defendant has been convicted before, I wonder if he did it again, I still think it is proper for a closing argument." We do not agree. See *Gray v. State,* 221 Md. 286; *Wethington v. State,* 3 Md. App. 237. The references to the prior convictions have added significance in light of what transpired before trial. The appellant had filed a motion to suppress the appellant's criminal record or at least all evidence tending to show that he had committed the same or similar crimes to those for which he was to be tried. The appellant excepted to the denial of the motion and the court said:

> "Responding to the defendant's exceptions, the Court has made it clear in chambers that the purpose for which a criminal record will be ruled admissible is to refer to the credibility of the defendant witness if he takes the stand and only if he takes the stand, and that the Court will make it amply clear to the jury that evi-

dence of previous convictions, if any, is not in any way to reflect upon the guilt or innocence of the accused as to the present offense charged."

We feel it was also improper for the prosecutor, in answering the "insinuation" of defense counsel that the victim was confused in his testimony, to tell the jury, "Never once when I talked to him did he vary one bit in what happened to him that night." This, immediately following a statement, "Well, let me tell you, and believe me, at any time that man came into my office, half way through the trial, any time before the trial, any time before Ann Atwell died, and said, 'I was wrong,' that would have been the end of it. Or even if he said, 'I am confused and I am not sure,' that would be the end of it, believe me," gave the clear impression to the jury that the prosecutor had talked to the witness prior to trial and that the victim's version of the incident was the same on those occasions as his testimony at the trial. By these remarks the prosecutor went outside the evidence and by so doing gave additional weight to the testimony of the victim that was not warranted by the evidence.

It is fundamental, of course, that an accused stands before the jury cloaked with the presumption of innocence and that if the jury is not convinced beyond a reasonable doubt of his guilt they must render a verdict of not guilty. It was said in *Allen v. United States,* 164 U. S. 492, 501-502:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments, and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion

of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself."

But the exclusive right to agree or not to agree rests with the jury. *Leupen v. Lackey,* 248 Md. 19, 25 quoting 1 Branson's *Instructions to Juries* (3rd Ed. A. Reid 1960 Replacement) 149; *Plumley v. State,* 4 Md. App. 671. The prosecutor here concluded his argument to the jury with these words:

"And if there is anyone on this jury that thinks this man should go free, then I want this jury hung so I can try that man again, because these people don't belong on the street. That is my feeling, and that is why I am here, and this is what I have got a job to do. People like that don't belong on the street. Thank you."

We think this statement urged the jury under no circumstances to find a verdict of not guilty, implored even one juror not to be convinced by the arguments of his fellows and to close his ears to their opinions, so that even if the large majority was of the opinion that the evidence was not sufficient to establish guilt beyond a reasonable doubt, the State would be assured of the opportunity to try the appellant again. We believe these remarks were highly improper.

Under the circumstances here, we believe that the motion for a mistrial made at the conclusion of the argument of the prosecutor properly preserved the question of the propriety of the argument. We do not think that the instructions previously given, viewed in the light of the subsequent argument, precluded the likelihood of prejudice. And we need not decide whether action could have been taken by the trial court—such as striking the improper statements, cautioning the jury to disregard them and giving them such proper additional instructions as the exigencies of the situation required—which would have been sufficient to overcome the likelihood of prejudice. No such action was taken and in its absence we think it clear—the arguments based upon the prior convictions of the appellant, the comments outside the evidence and the entreaty to the jurors

to find the appellant guilty or to reach no agreement being improper—that the jurors were likely to have been misled or influenced to the prejudice of the appellant. We recognize that the granting or refusal of a mistrial is a matter lying within the sound discretion of the trial court, *Matthews v. State,* 3 Md. App. 555, 559, but here the mistrial was refused because the trial court believed "without question that the State's Attorney was sufficiently circumspect and within proper limits of a closing argument and the rules applying thereto." We do not agree. We feel that the appellant was denied a fair and impartial trial. Therefore, the trial court's discretion was not soundly exercised but was abused and the conviction must be set aside. We cannot say that the argument of the prosecutor was justified because defense counsel "was given considerable latitude in reading from Trial Magazine, relating their personal experience at the Bunny Club, reciting prayers of Benedictine Monks, and quoting poetry in their closing argument." Nor can we find, on the record before us, that there was no ground for complaint because the improper remarks of the prosecutor were provoked by similar remarks of defense counsel or replied to in like manner. See 5 Wharton's *Criminal Law and Procedure* (Anderson) § 2083, p. 242. And we do not feel that the improper argument could be warranted by "the tenor of the arguments, the relationships of the parts of the arguments to each other, and the overall argument."

In view of our holding we do not reach the other questions presented.

*Judgment reversed; case remanded for a new trial.*

## APPENDIX A

### CLOSING ARGUMENT OF THE STATE

May it please the Court, Mr. Foreman, ladies and gentlemen of the jury: I realize that it is late, it is lunchtime, and I am going to try to be as brief as possible in my closing argument, but I can't. I am afraid

it may be too lengthy, I don't know. But I am concerned, concerned in many ways.

Now, the defense attorneys have gotten up here and they have inferred a lot of things. They said that most assault and battery charges are Magistrate's court. I don't believe that. They tell you that I have a burden of proof beyond a reasonable doubt and to a moral certainty. No problem with that. Now, I think you all know, I don't have it to a mathematical certainty. This is almost impossible on the State's part. Certainly we like more evidence in every case. But I don't think that we have or need any more evidence in this case one way or the other. This I sincerely believe.

They insinuate to you that this boy, Ralph Newton —incidently, a man that has never been in trouble, doesn't have a record, has no trouble with the police— is confused. Well, let me tell you, and believe me, at any time that man came into my office, half way through the trial, any time before the trial, any time before Ann Atwell died, and said, "I was wrong", that would have been the end of it. Or even if he said, "I am confused and I am not sure", that would be the end of it, believe me.

Never once when I talked to him did he vary one bit in what happened to him that night. And this bothers me, because if any one of you went down the street and you were alone, and you come upon someone, and you have known him, there have been bad words and he cuts you, and there are no other witnesses around, and a friend of his is with him, and later dies and they blame it on the friend, what chance do we have? That is what bothers me. The defendant is not on trial here, it is the victim, and it happens all the time. Here is a man who is going to have a scar for the rest of his life.

Now, he could come in and read any editorial he wants to read about freedom, and believe me, he insinuates, this man right here insinuates that their rights have been violated. There is not a right that has been

violated, that man sitting right there. He had a perfectly fair trial here. And I am sick and tired of defense attorneys coming in here and telling me or inferring that I am out to get this man, the police department is out to get this man, because he has got a record. That is silly. He has got a record of four assaults and batteries because he committed them. Can you imagine that? He assaulted people four times, among other things. He has been on that witness stand many times.

They say, no, no, when he takes that witness stand he is not going to lie. That is the most unbelievable story I ever heard of this man. Standing there looking north so he couldn't see anything.

Now, these things bother me, they really do, because the State is on the defensive anyway, it is my belief, but there is nothing here that this man's rights have been violated, believe me.

And they say, well, now, if Ann Atwell was here, according to their insinuation, you would change your story. Well, believe me, if I had Ann Atwell here, and you heard her testimony, there would be no change in any story.

Then they go on and tell you about a wheelbarrow and a bunny tail. We are not talking about bunny tails in this case. This is a serious case. I think this man is lucky, I think this man is lucky he is not in here on a murder charge. That is why I think he is lucky. I think he is fortunate that he is not facing the gas chamber and he is only here on assault and battery. I have thought this ever since I had this case, he is a lucky boy.

Now, it is funny how things will change. I didn't say anything. They jumped from six to eight drinks Ralph Newton had that night, and jumped from 12 to 16 ounces. Maybe that is petty and I am not going to pick on it. Mr. Newton said that he had up to six drinks, he didn't think he had any more. Now, they say, well, that is a full pint. Well, 16 ounces is a full pint, 12 ounces isn't. We are dealing with a 270 pound

man. I believe that he was not drunk that night, I believe he saw what happened to him. He is very truthful. And they say, well, now, maybe he didn't see Ann have her hands crossed. He never waivered once in his testimony through cross-examination by the defense attorneys. I put him up here, the best way I could show you how this happened. I told him to put the people exactly the way they were, and he did.

They insinuate that the defendant was on the side of him. He wasn't on the side of him, he was directly across from him, and Miss Atwell was backed up against Bridge Street. Now, just take that and how would it be physically possible for Ann Atwell to cut this man? Throw away the hand bit on the left side of the check.

Now, you want to talk about circumstantial evidence. There is a man who is right-handed, and you look at this, and they want to tell you that a woman did this (indicating photograph). Amazing.

They say they think he is an honest man, but he honestly doesn't know what happened. Ralph Newton appeared to me to be a fairly intelligent young man, a man that works for a living, a man that lives with his parents in the Manor, a man that has never been in trouble before, and here he is on trial. I will tell you one thing, there was nothing wrong with Newton until he got cut. Then something was wrong with him.

Then it bothers them that there was no blood that they could find between the spot that it happened and the porch. Well, he told you he put his hand up there, and got back to the porch, and when Butler came out, that is when he took his hand away, that is when it really went, because it laid his whole side of his face down, and he was bleeding, through his clothes and then on the porch, and there was a lot of blood on that porch.

We got Odie Gilbert on the stand and he said he didn't see any blood. I wonder how much Odie saw that night, I really do, a man who was playing poker and drinking all afternoon, and tending bar.

Then they characterize the defendant, they say he is 25 years old, one of 10 children, he is married, he is an average man, not in high society, and, well, he is a little weak. He is a little weak. That bothers me. This man is not weak. This man over here does what he wants to do, and he has done what he wanted to do all his life. There is no question about that. He runs around on his wife, he has got a little girl seven months old, and he told you, and he kind of smiled on the stand, that he dated Ann Atwell until the time that she died.

And believe me, ladies and gentlemen of the jury, there is no evidence to consider here that she committed suicide. They insinuate that. There is no evidence you have to consider on that point. I don't know why they bring it in any way, but they gave you the story of the bunny tail, a little suicide.

This man dated her, he dated her when he wanted to, he does what he wants to do. That is not a sign of a weak man. He is weak all right, because he can't hit anybody with a fist, he has got to take a knife out and cut him, or he has got to take an object out and cut him. Boy, I don't care how heavy you are, you can be 350 pounds, when they come up with something like that you have got a problem.

Then they blame Ann on the problems that he has, that Ann was running the show, that Ann came over and picked him up at Weaver's, that Ann did all this. Ann is the one that is chasing him and he is too weak to do anything about it.

Then they say, well, where is the weapon? We know that there was a weapon used. The doctor said it was an irregular object that cut this man. They say, now, you haven't got the weapon. I wonder how many men it would take to find a weapon alongside the road between here and Weaver's. I just wonder. And then how would we prove it came from this incident here?

Then they gave you a summary of Ann; why Ann would have done it. They said that she was insistent

on making a contact with Holbrook, that was a reason. She wanted him over here instead of Newton. That was the reason. I have several others. I don't see how they are relevant. But even if you take that, I can't understand their position. Because if you believe Holbrook, Holbrook said no, he didn't hear any talking, the only thing he heard was a swish. And this is unbelievable too, for a person that was dancing with Newton the evening before. Ann Atwell never cut this man. The evidence shows that she didn't.

Then they said, well, now, the State likes to infer that a person who has got a record and takes the witness stand will lie. I won't say that on behalf of the State at any time. The reason that a man's record is brought out, if he takes the stand, is his credibility to tell you the truth. That is the only thing. Now, what he did in the past, what is involved there, is credibility. What you are doing, you balance the credibility of a man that has all these convictions and you say, well, I wonder if he did it again? I think the evidence shows that he did it again.

I know why Newton retreated. Newton would probably retreat today, if he has to go out in the street and meet up with him. I think I probably would retreat. I think it would be a smart thing to do if I walked down the street and met him, I probably would cross the street.

They keep harping and harping, not sufficient evidence, not sufficient evidence. But if there wasn't sufficient evidence in this case we wouldn't be here right now taking up your time.

Don't forget, and they minimize this, he did say, Do you want more of the same? Then one of them ended up with a poem and the other ended with a prayer about how you have this man's life in your hands. Ladies and gentlemen of the jury, this is your duty. This is our system of justice. You have nothing to consider except if he is guilty of assault and battery. You don't have to worry if he gets one day, if he gets

20 years. That is the Judge's duty. You are here to determine if he was in fact guilty of assault and battery of Ralph Newton. And I tell you, if you believe this man over here and this fantastic story, then we are on hard times.

I submit to you that anyone that says at 11:15 he called his wife, then I said, "How are you going to get home?" then he thought, "Oh, I am in a bind now. I was going to call her again and tell her to pick me up out front, or pick me up around the corner. That is what I was going to do, I was going to walk out and walk up to the corner and go to a pay 'phone and call my wife to pick me up there, because I am ashamed."

This man has no shame. This man freely ran with that woman until she died. He has probably run with others, I don't know. There is no shame there.

There is no corroboration here that this man ever called his wife. None. That is what he tells you, he called his wife. He says, "I am going to be home now, I am coming home," and yet at 1:15 he is down at the pool hall, and the explanation for that is, because he is a weak man. This girl says, "Come on and play pool with me." If you believe this kind of nonsense, then we are on hard times.

I think that I have a right, anyone has a right, to come out of the VFW, to walk outside, and to walk down the street and say good night to someone without getting cut. And you might say, what is the motive? The motive is, this man here is an extremely jealous man, I think. I think he has got mental problems. Anyone that has got a record like that has got mental problems, something wrong with him. There is something wrong with him when he takes advantage of a man with a knife. And this bothers me. If he was jealous of this girl and he didn't want Ralph Newton talking to her he could have hit him. But no. He takes out an instrument and he slashes him and says, "You want more of that?" And by golly, what

would you do? And I don't think we have to put up with people like that in society. This is your duty. And if there is anyone on this jury that thinks this man should go free, then I want this jury hung so I can try that man again, because these people don't belong on the street. That is my feeling, and that is why I am here, and this is what I have got a job to do. People like that don't belong on the street. Thank you.